UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

JEFFERY JOE MCKIM,                    )
                                      )
            Plaintiff,                )          No. 6:19-CV-225-REW
                                      )
v.                                    )
                                      )          OPINION & ORDER
MITCHELL DYER, *et al.*,               )
                                      )
            Defendants.               )

*** *** *** ***

Jeffery Joe McKim sued Bureau of Prisons (BOP) physician assistant (PA) Mitchell Dyer in a *Bivens* action claiming Dyer violated his Eighth Amendment rights by delaying treatment for McKim's chemical burn, suffered during BOP custody. *See* DE 6. Dyer moved for summary judgment, claiming McKim cannot demonstrate that Dyer acted with deliberate indifference. *See* DE 29. McKim responded. DE 33 (Response). Dyer replied. DE 37 (Reply). The motion is now ripe for review.

## Background[1]

McKim was an inmate at USP McCreary. *See* DE 6 at 2-3. While imprisoned, he took care of the floors—including stripping, polishing, and waxing. *See id.* at 4. On April 12, 2018, McKim stripped wax from a barbershop floor. He later removed his shoes and socks and noticed that the tops of his feet had turned black; he had been burned by the chemical used to strip the floors. *See id.* at 4-5. McKim went to the USP McCreary

---

[1] The Court derives this mostly from the Amended Complaint and the filed medical records. *See generally* DE 6 (Amended Complaint); DE 29-1 ("BOP Medical Records"); DE 33-3 (May 23, 2018, UKMC Medical Record); DE 33-6 (September 17, 2018 Medical Record); DE 33-7 (October 31, 2018, UKMC Medical Record).

health clinic where PA Dyer evaluated his condition. *See id.* at 5. On review, Dyer immediately sent McKim to a local hospital emergency room for treatment. *See id.* Dyer perceived McKim as having severe second- or mild third-degree burns. *See id.*; DE 29-1 at 175 (BOP Medical Records). The local ER sent McKim directly to the University of Kentucky Medical Center (UKMC) for specialized treatment. *See* DE 6 at 5. He received emergent care, and UKMC discharged him back to the BOP. *See* DE 29-1 at 322-29 (describing UKMC's April 12, 2018, burn treatment and noting McKim's discharge that same day).

When McKim returned from UKMC, Dyer understood that McKim required additional treatment to address his burns—namely UKMC wanted to perform a skin graft on McKim and would call the BOP to arrange his appointment. *See* DE 29-1 at 169 (BOP Medical Records). Later, with McKim back at UKMC, a UKMC representative called Dyer to coordinate McKim's follow-up surgery. *See id.* at 156. Notably, however, the representative indicated that UKMC was unsure whether McKim would need a skin graft or Integra treatment (a different graft procedure). *See id.* at 156.

Two days later, Dyer called UKMC and learned that McKim would stay at the hospital for approximately one week before he received treatment—either a full skin graft or Integra before receiving a graft later. *See id.* at 151. Five days later, when Dyer called again to check on McKim, a nurse indicated that McKim was in surgery receiving Integra grafts on both feet. *See id.* at 150. The following day, May 11, 2018, Dyer received a call from a nurse instructing Dyer on McKim's required wound care and scheduling McKim's follow-up with the surgeon for May 23, 2018. *See id.* at 148. McKim returned to the

2

BOP, and Dyer conveyed to McKim how to care for his Integra grafts consistent with the instructions conveyed from UKMC. *See id.* at 145.

On May 23, 2018, McKim attended his post-operation visit at UKMC. *See* DE 33-3 (Post-Operation UKMC Medical Record). The surgeon (Dr. Stewart) discussed the risks and benefits of skin grafting; McKim elected to proceed with the next operation. *See id.* (chronicling McKim's May 23, 2018, visit to the UKMC). The UKMC record of that visit indicated UKMC would initiate surgical scheduling and "will contact prison with surgery details." *See id.* The BOP records do not show post-visit contact from UKMC regarding this topic. Also, McKim did not prompt any medical visits with Dyer after this May 23, 2018, check-up, until June 5, 2018; he requested a renewed Motrin prescription, which Dyer granted. *See* DE 29-1 at 125 (BOP Medical Records). Interestingly, Dr. Stewart saw McKim at UKMC on May 23, but he did not sign the medical note, as "author," until July 12, 2018. DE 33-3, at 3 (May 23, 2018, UKMC Medical Record). Per the BOP records, Dyer and Dr. Carrie Cunnagin, the physician over McKim's case, were waiting to hear from UKMC after "his scheduled appointment." *See* DE 29-1 at 129 (BOP Medical Records); *see also* DE 29-1 at 133 ("Phone conference with UK Plastics . . . medical staff to return call to prison once doctor is contacted for further treatment plan in regards to skin graft").

The UKMC records show that the BOP transported McKim for a follow-up with Dr. Stewart at UKMC plastics on June 20, 2018. *See* DE 29-1 at 292 (recording McKim's visit to UKMC on June 20, 2018). For reasons not clear in the record, the transport arrived late, after Dr. Stewart had left. McKim instead saw a nurse, who per Plaintiff, merely directed continued wound care. *See id.*; *see also* DE 6 at 7. At a follow-up chart

review the next day that Dyer had pre-set, (*see* DE 29-1 at 133) McKim told Dyer about the abortive UKMC visit. Dyer assessed McKim and immediately initiated a consult request for a plastic surgery evaluation within one week. *See id.* at 120. He labelled the situation "urgent." *Id.* And the next day, Dyer received and implemented new orders "per plastic surgery" for wound care, altering McKim's daily wound regimen. *See id.* at 117.

Over the next month, McKim went to the USP McCreary health clinic for only non-burn-related issues—such as digestive, heart, vision, and neurological problems. *See id.* at 96-111. The next activity at UKMC occurred on August 22. *See id.* at 283-84. UKMC plastics saw McKim that day and called the BOP on August 24. *See id.* at 86 (BOP Medical Record chronicling communications from UKMC on August 24, 2018). Dyer notes in the records that UKMC "[s]tates that inmate feet have gotten worse and that he needs to have a skin graft very soon…they want to perform surgery very soon." *Id.* Dyer, on a record that included Dr. Cunnagin, immediately requested that the outpatient grafting surgery occur by August 29, 2018; he set the priority as "emergent." *Id.* Dr. Cunnagin cosigned on August 28. *See id.* at 87. The surgery occurred at UKMC on September 17, 2018. *See* DE 33-6 (September 17, 2018, UKMC Medical Record).

McKim stayed at UKMC in the days immediately following his skin graft. *See* DE 29-1 at 85-71 (noting McKim's progress at UKMC from September 17 until his eventual return to McCreary on September 21). Dyer evaluated the skin graft on September 24, noting no bleeding, ordering daily dressing changes, and requesting a UKMC follow-up on October 3, 2018. *See id.* at 55-59. Dyer next met with McKim on October 11, 2018, to renew his ibuprofen prescription. *See id.* at 53.

4

On October 19, 2018, McKim met Dyer and discussed a potential new skin graft and renewed medications. *See id.* at 52. Dyer requested a follow-up on McKim's behalf at UKMC for October 26, 2018. *See id.* After McKim followed-up with UKMC plastics on October 31, he saw Dyer on November 7. *See id.* at 49. Dyer learned that UKMC recommended another follow-up plastics consultation in three weeks as well as a consultation for physical therapy. *See id.* Dyer promptly placed requests for both new consultations—targeting November 21, 2018, for the skin graft follow-up, and November 14, 2018, for an "inhouse PT consult" addressing toe range of motion and scar management. *See id.* McKim checked-in with Dyer on November 16, 2018, to request additional Motrin for pain from his feet. *See id.* at 46-8. Dyer addressed the request. *See id.* at 48.

During this period, McKim's release date approached. On December 4, 2018, McKim met with Dyer to address pain on his second and third toe. *See id.* at 41. Dyer addressed McKim's concerns and discussed with McKim and Cunnagin, DO, how to clean and care for his wound. *See id.* at 42. McKim last met with Dyer on December 14, 2018, McKim's release day. *See id.* at 37. McKim stated that his wound had healed, lacked any signs of infection, and felt much better. *See id.* Dyer confirmed. *See id.* Before McKim departed, Dyer explained potential warning signs for McKim to look for upon release and recommended that he visit the emergency department or his primary care provider should symptoms arise. *See id.*

McKim sued Dyer under *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 91 S. Ct. 1999 (1971), claiming that Dyer (and others, mostly unnamed) abridged his Eighth Amendment right to be free from cruel and unusual

punishments. *See* DE 6 at 2. Namely, McKim claimed that Dyer was deliberately indifferent to McKim's serious medical needs when he failed to provide timely medical treatment. *See id.* at 10-11. McKim claimed no problems with Dyer until early June. *See* DE 33-1, at 13 ("first week of June"). The Court thus focuses on the delayed surgery and then the later failure to timely provide physical therapy ("PT"); these are McKim's foci.

## Legal Standards

### *(a) Summary Judgment Standard*

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A reviewing court must construe the evidence and draw all reasonable inferences from the underlying facts in favor of the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 106 S. Ct. 1348, 1356 (1986); *Lindsay v. Yates*, 578 F.3d 407, 414 (6th Cir. 2009). Additionally, the court may not "weigh the evidence and determine the truth of the matter" at the summary judgment stage. *Anderson v. Liberty Lobby, Inc.*, 106 S. Ct. 2505, 2511 (1986).

The burden of establishing the absence of a genuine dispute of material fact initially rests with the moving party. *Celotex Corp. v. Catrett*, 106 S. Ct. 2548, 2553 (1986) (requiring the moving party to set forth "the basis for its motion, and identify[] those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate an absence of a genuine issue of material fact"); *Lindsay*, 578 F.3d at 414 ("The party moving for summary judgment bears the initial burden of showing that there is no material issue in dispute."). If the moving party meets its burden, the burden then shifts to the nonmoving

party to produce "specific facts" showing a "genuine issue" for trial. *Celotex Corp.*, 106 S. Ct. at 2253; *Bass v. Robinson*, 167 F.3d 1041, 1044 (6th Cir. 1999). However, "Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 106 S. Ct. at 2552; *see also id.* at 2557 (Brennan, J., dissenting) ("If the burden of persuasion at trial would be on the *non-moving* party, the party moving for summary judgment may satisfy Rule 56's burden of production in either of two ways. First, the moving party may submit affirmative evidence that negates an essential element of the nonmoving party's claim. Second, the moving party may demonstrate to the Court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim." (emphasis in original)).

A fact is "material" if the underlying substantive law identifies the fact as critical. *Anderson*, 106 S. Ct. at 2510. Thus, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* A "genuine" issue exists if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 2511; *Matsushita Elec. Indus. Co.*, 106 S. Ct. at 1356 ("Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'") (citation omitted). Such evidence must be suitable for admission into evidence at trial. *Salt Lick Bancorp v. FDIC*, 187 F. App'x 428, 444–45 (6th Cir. 2006).

*(b)* Bivens *Eighth Amendment Standard*

Under *Bivens*, plaintiffs may vindicate certain constitutional rights violations by suing the offending federal officers in their individual capacity for damages. *Bivens v. Six Unknown Named Agents of the federal Bureau of Narcotics*, 91 S. Ct. 1999, 2001 (1971). Although *Bivens* initially arose from the Fourth Amendment, the Supreme Court has since applied the doctrine to inmates under the Eighth Amendment, with respect to deliberate indifference to medical needs. *See Carlson v. Green*, 100 S. Ct. 1468, 1471-74 (1980) (extending *Bivens* to include Eighth Amendment medical claims); *see also Farmer v. Brennan*, 114 S. Ct. 1970, 1974 (1994) (defining the constitutional standard as to prisoners' safety); *see also Estelle v. Gamble*, 97 S. Ct. 285, 291 (1976) (defining the "deliberate indifference" standard in the medical care context). To succeed on a *Bivens* claim alleging inadequate or delayed medical treatment, a plaintiff must demonstrate that the officer was "deliberately indifferent" to the inmate's serious illness or injury. *Estelle*, 97 S. Ct. at 291.

Deliberate indifference has both objective and subjective components. *See Wilson v. Seiter*, 111 S. Ct. 2321, 2323-26 (1991). Objectively, the plaintiff's medical need must be "sufficiently serious"—that is, "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for doctor's attention." *Blackmore v. Kalamazoo Cty.*, 390 F.3d 890, 895, 897 (6th Cir. 2004). Subjectively, the defendant must have known and disregarded an excessive risk to the prisoner's health and safety. *See Clark-Murphy v. Foreback*, 439 F.3d 280, 286 (6th Cir. 2006). This subjective element aims to prevent "medical malpractice claims from being transformed into Constitutional claims." *Quigley*

*v. Tuong Vinh Thai*, 707 F.3d 675, 681 (6th Cir. 2013). "This showing requires proof that each defendant 'subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk' by failing to take reasonable measures to abate it." *Griffith v. Franklin Cty., Kentucky*, 975 F.3d 554, 568 (6th Cir. 2020) (citations and quotations omitted) (equating the standard to "criminal recklessness"). When the plaintiff *does*, in fact, receive medical care, he must show that the medical treatment received was "so woefully inadequate as to amount to no treatment at all." *Asplugh v. McConnell*, 643 F.3d 162, 169 (6th Cir. 2011).

Thus, put simply, Dyer is entitled to summary judgment if McKim cannot establish a triable issue as to even one of these elements, based on the evidence in the record and all justified inferences drawn in his favor.

## Discussion

### (a) McKim's Serious Medical Needs

McKim must have suffered a "serious medical need," that is, "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Brooks v. Celeste*, 39 F.3d 125, 128 (6th Cir. 1994); *Harrison v. Ash*, 539 F.3d 510, 518 (6th Cir. 2008). Further, "an inmate who complains that delay in medical treatment rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment[.]" *Napier v. Madison Cty.*, 238 F.3d 739, 742 (6th Cir. 2001).

Here, Dyer concedes that McKim's burns constituted a serious medical need. *See* DE 29 at 5. The chemical wax stripper severely burned the skin atop McKim's feet, such

9

that neither the USP McCreary medical clinic nor the Lake Cumberland Emergency Department could properly treat him. *See* DE 33-2 at 22 (Dyer Dep.); DE 6 at 5. Further, Dr. Stewart's expert report and deposition adequately support a delay theory. *See* DE 33-10 at 2-3 (Dr. Stewart's Expert Report); DE 33-9 (Dr. Stewart Dep.). Thus, McKim suffered a serious medical condition when he burned his feet with the chemical wax stripper. This required proper and timely medical attention.

### *(b) Deliberate Indifference*

Next, the Court probes for a triable issue on whether Dyer was deliberately indifferent to McKim's serious medical need. "[T]he deliberate indifference standard 'describes a state of mind more blameworthy than negligence[.]'" *Brown v. Bargery*, 207 F.3d 863, 867 (6th Cir. 2000). "An accident, although it may produce added anguish, is not on that basis alone to be characterized as wanton infliction of unnecessary pain." *Estelle*, 97 S. Ct. 285. To meet the subjective component, McKim must, therefore, establish: (1) Dyer perceived facts from which he could infer a substantial risk to the prisoner, (2) Dyer drew that inference, and (3) Dyer then disregarded that substantial risk. *See Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001) (citing *Farmer*).

The Court has surveyed the briefs and the full record. Defendant cites, with reference to numerous record entries, a lack of evidence to support, in any way, that he consciously disregarded a risk of serious harm to McKim. *See* DE 29 at 1. The Court agrees and observes the following.

First, McKim has no complaints about Dyer's treatment up into the first week of June. Dyer, after all, had responded immediately on the burn issue, securing emergency

treatment that routed McKim to UKMC. *See* DE 6 at 5. Dyer had seen McKim and responded to his needs up to that point.

McKim has little information regarding what he conveyed to Dyer in June. He testified to a "complaint," but he offers no details. *See* DE 33-1 at 76-77 (McKim Dep.). The testimony suggests that McKim dealt primarily with his nurses in the weeks after the May 23 visit and did not meet with Dyer until he "demanded to see Dyer" after the June 20 tardy trip to UKMC. *See id.* Certainly, the medical records suggest no pertinent interaction in that window of time. *See* DE 29-1 at 96-111 (BOP Medical Records). McKim offers nothing to indicate that Dyer bears any blame for the late appearance at the June 20 UKMC appointment.

And what did Dyer know around the time? The records show, explicitly, that Dyer knew McKim was in UKMC's hands. Dyer expected to hear back from UKMC on any needed further steps or treatment ensuing from the May follow-up. *See id.* at 133 (indicating Dyer awaited a call from UKMC to discuss further treatment). Quite simply, there is nothing in this record to show that the UKMC plastics viewpoint from May 23 made it to Dyer or the BOP. McKim himself claims the information did not reach the BOP until *August* of 2018, well after the May-June period. *See* DE 33 at 4. Although Dr. Stewart criticizes the delay, he evidently did not sign his own May 23 notes until mid-July. *See* DE 33-3 at 2. There is nothing in the record to support that UKMC initiated scheduling after the May visit. *See also* DE 29-4 at 56 (Dr. Stewart Dep.) (disclaiming any knowledge of "what occurred as far as with the schedulers or with the clinic personnel"). Indeed, Dr. Cunnagin's note from May 31 suggests she yet awaited word

from an upcoming UKMC follow-up. *See* DE 29-1 at 126 (BOP Medical Records). This shows the BOP was in the dark regarding the May 23 visit and its results.

Dyer did see McKim on June 21, just after the abortive June 20 UKMC visit. At that June 20 visit, the UKMC nurse advised continued wound care, and McKim left perplexed. *See* DE 29-3 at 77 (McKim Dep.) ("And she reiterated again we'll just continue with wound care."). When McKim met with Dyer the following day, Dyer listened to him and examined his wounds. *See* DE 29-1 at 118-120 (detailing McKim's June 21, 2018, clinical encounter with Dyer). Dyer's response was an immediate request for a consult, prioritized as "urgent," with a target date one week out from the consult request. *See id.* at 120.

McKim did not get back to UKMC until mid-August. *See id.* at 86. Dyer heard again from UKMC after that visit, and UKMC plastics expressed some urgency in the surgery. *See id.* Dyer again immediately made the consultation request, now marked "emergent." Dr. Cunnagin cosigned. *See id.* at 86-87. The surgery occurred in mid-September.

There are mysteries here. Why the delay from May to June? Why did the UKMC May request not make it to the BOP? Why did Dyer's urgent consultation request in June not produce an earlier concrete event? Why was McKim late to the June 20 appointment? Why did the August consultation request not produce an earlier surgery? On this record, these posers are unanswerable. Despite that, the key for this motion is whether Dyer is at fault, in a constitutional way.

The Court acknowledges that Dyer viewed the situation, from day one, as significant. He made the burn diagnosis and prompted emergent treatment. *See* DE 29-2

at 24-26 (Dyer Dep.). He was aware of the need for celerity in burn treatment. *See* DE 33-2 at 21-22 (Dyer Dep.). All of that said, the Court sees no basis on which a rational fact finder could deem Dyer deliberately indifferent. To the contrary, he responded with treatment or a priority outside consultation request at each step along the story.

Importantly, as Dyer expressly testified, he was the point of contact and made consult requests. *See* DE 29-2 at 24-25 (Dyer Dep.). However, the mechanics and manner of approval were matters above his authority. *See* DE 33-2 at 79 (Dyer Dep.) ("Like I said, it – I am unable to approve or schedule these appointments, so, therefore, it goes to the clinical director for approval."); *id.* at 78 (discussing the June request: "[I]t's the – the acting clinical director who would have to approve that, so this goes into – I don't know their end of the computer system. I know there's some things they have to do to review these things.").

The PT delay, a claim subset, bears the same analysis. Dyer first learned of the PT recommendation when he saw McKim in his clinic on November 7. *See* DE 29-1 at 49 (BOP Medical Records). Dyer, again, immediately made the consult request. *See id.* This occurred less than eight weeks after the graft surgery. Dr. Stewart testified that he wanted PT to commence 6-8 weeks after McKim had a "stable healed wound" post-surgery. *See* DE 29-4 at 63 (Dr. Stewart Dep.). There may have been administrative delays that kept the PT from commencing before McKim left custody. The record does not support that Dyer intentionally effected delay in any manner. *See* DE 33-2 at 84-85 (Dyer Dep.) (Dyer noting that McKim's consult required an in-house physical therapist from Lexington; Dyer said: "I don't know the specifics of why they couldn't have made it earlier or what

they were able to see on their end of the consult[.]"). McKim offers no proof that would saddle Dyer with fault for the delay.

Ultimately, McKim is quite right to feel mishandled throughout this incident. He suffered a serious burn on the BOP's watch. The involved institutions (the BOP, then UKMC) communicated poorly on some of the mechanics, expectations, and details. The reasons for interim delays of importance are unclear. However, here the Court evaluates whether McKim survives in a *Bivens* claim against Dyer. Such claims rise or fall on Dyer's conduct alone. The Court sees no genuine dispute of material fact here. At most, McKim might complain that Dyer could have been more insistent or more proactive as a point of contact. Those ideas sound in negligence. McKim has not established proof to support a finding that Dyer acted with a culpable mind, that he consciously disregarded a substantial risk of serious harm. To the contrary, Dyer acted to order treatment or secure expert consultation at each interaction in the spring and summer of 2018. If there is constitutional fault for McKim's harms, it does not lie with Dyer.[2]

### Conclusion

The Court **GRANTS** DE 29, for the stated reasons. The Court also **DENIES** DE 28, as likely moot. Although DE 6 named Doe Defendants and the United States, the Court is dubious that any active claim or party yet remains, given the *Bivens* limitations on potentially liable parties, the inapplicability of vicarious liability, and interim changes

---

[2] Notably, Dr. Cunnagin was in the loop and on almost all of the key medical documents. McKim sued but then dropped Dr. Cunnagin, dismissing his claims against her with prejudice. *See* DE 6 (Amended Complaint); DE 24 (Agreed Order of Partial Dismissal). It is difficult to perceive a meaningful distinction between the two.

in the pleadings and party roster.[3] The parties shall file status reports within ten days indicating whether any claims persist for adjudication.

This the 20th day of January, 2022.

Signed By:

**Robert E. Wier**

**United States District Judge**

---

[3] McKim cannot sue the United States or federal agency under *Bivens*. *See e.g.*, *Shaner v. United States*, 976 F.2d 990, 994 (6th Cir. 1992) ("[A] *Bivens* action may be brought only against individual federal officials, not against the United States."); *FDIC v. Meyer*, 114 S. Ct. 996, 1006 (1994). Further, "[b]ecause vicarious liability is inapplicable to *Bivens* and § 1983 suits, [McKim] must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *See Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1948 (2009).